CITY OF FLINT v CHRISDOM PROPERTIES, LTD

Docket No. 283245. Submitted April 7, 2009, at Detroit. Decided April 21, 2009, at 9:10 a.m.

The city of Flint brought an action in the Genesee Circuit Court against Chrisdom Properties, Ltd, James Crawley, and others, alleging breach of contract and seeking foreclosure of a mortgage extended to Chrisdom and Crawley (hereafter defendants). The defendants counterclaimed breach of contract and slander. The city had loaned the defendants money to fund a redevelopment of two buildings into condominiums, but had delayed issuing a building permit for a year and refused to release from the mortgage condominium units that were ready for sale. The city brought its action when the defendants fell delinquent on their loan payments. In the middle of trial, the court, Archie L. Hayman, J., permitted the defendants to add frustration of purpose and impossibility to their defenses and affirmative defenses. The court ultimately decided to release the defendants from any obligations under the loan agreement or mortgage with the city, and awarded damages to the defendants on their counterclaim. The city appealed.

The Court of Appeals *held*:

1. The trial court did not err by deciding that the city had frustrated the purpose of the loan contract. Frustration of purpose is generally asserted where a change in circumstances makes one party's performance virtually worthless to the other, frustrating that party's purpose in making the contract. The frustration must be so severe that it is not fairly to be regarded as within the risks that the party assumed under the contract and the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. In this case, the city intentionally or incompetently frustrated the purpose of the contract by delaying the issuance of a building permit and refusing to release ready-for-sale condominiums from the general mortgage.

2. The trial court correctly decided that the city breached the loan contract. The city breached the contract for the same reasons it frustrated its purpose.

3. The trial court's award of damages is as close as possible to mathematical precision under the facts of this case.

4. The defendants have not received a windfall in retaining the buildings and being awarded damages. The award of damages was for the defendant's counterclaim while the discharge of the mortgage was an independent equitable award.

Affirmed.

CONTRACTS — FRUSTRATION OF PURPOSE.

Frustration of purpose is generally asserted where a change in circumstances makes one party's performance virtually worthless to the other, frustrating that party's purpose in making the contract; the frustration must be so severe that it is not fairly to be regarded as within the risks that the party assumed and the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

*Mantese & Rossman, P.C.* (by *Gerard V. Mantese* and *Ian M. Williamson*), for the city of Flint.

*Harris, Goyette, Winterfield, Penskar & Farrehi* (by *Alan D. Penskar*) for Chrisdom Properties, Ltd, and James Crawley.

Before: CAVANAGH, P.J., and FORT HOOD and DAVIS, JJ.

DAVIS, J. Plaintiff/counter-defendant city of Flint (Flint) appeals as of right the trial court's judgment in favor of defendants/counter-plaintiffs Chrisdom Properties, Ltd, and James Crawley (Chrisdom and Crawley).[1] We affirm.

This case arises out of a downtown housing development in the city of Flint. Trial testimony was lengthy and detailed, but, in a nutshell, Flint and Chrisdom entered into a loan agreement under which Flint extended $1.8 million from the federal Department of

---

[1] For purposes of this appeal, Chrisdom is effectively the corporate alter ego of Crawley. We therefore treat them somewhat interchangeably.

Housing and Urban Development to Chrisdom for the purpose of converting two buildings into condominiums. One of those buildings was already owned by Crawley and 100 percent renter-occupied as a high-end apartment building and the other was an immediately adjacent dilapidated structure that Crawley had to purchase.

The loan agreement was poorly structured from the outset. However, Flint—indeed, the same department of the city that had been responsible for the loan—then inexplicably held up the issuance of a building permit to Chrisdom for 13 months after the Building Code Board of Appeals found that Chrisdom was entirely in compliance. Flint offered no justification for this; however, as a result, construction work could not be performed efficiently. Any possibility that the work could be performed within the timetable of the construction loan was abrogated by Flint.[2]

It is worth noting that Crawley testified without contradiction that he had been involved in contracting in Flint for over 40 years and had been issued hundreds of permits. The normal amount of time to obtain a permit never exceeded two weeks. Also, the State Con-

---

[2] Crawley explained that building construction was similar to assembly-line construction of an automobile, in that a great many activities had to be coordinated and performed in a controlled sequence, but the lack of a building permit prevented that process from functioning. Crawley described an ongoing pattern of indifference after Mayor Woodrow Stanley was recalled in 2002, after which a succession of department heads and other officials either did not respond to him or treated the project as irrelevant. Glenda Dunlap, who testified that she "was the staff person assigned to to [sic] the project," impliedly supported Crawley's opinion by testifying that, among other things, the "City did not want this project." Michael Anthony Freeman, a financial underwriter specialist later asked by the Genesee County Land Bank and paid by the Mott Foundation to get the project back online, testified that when he submitted various proposals to Mayor Don Williamson, Mayor Williamson's response was an explicit directive to "bust his balls," referring to Crawley.

struction Code requires the issuance of a permit within 15 days after an application. MCL 125.1511. Flint argues that this deadline applies only when the application conforms to the code, but the year-long delay here was *after* the board of appeals determined that the Manhattan Place project *was* in compliance.

Additionally, Flint refused to allow any individual condominium units—some of which, having originally been apartments, were ready for sale—to be released from the general mortgage for sale to potential buyers. The construction loan agreement contained no provision governing such releases, but such releases are common in condominium construction projects, and the documents did imply that they should be granted. Further, the contract between the parties provided that Flint was to receive 100 percent of the condominium sale proceeds until such time as the loan made to the contractor was paid in full, which was an unusually good deal for the lender. Moreover, Flint was repeatedly advised that the only way its loan could be repaid was by selling the individual condominium units. Crawley testified that if he could have sold the existing units, he would have paid off the loan and have enough left over to finish the entire project.

Flint did not at any time attempt to provide any sort of justification for withholding the building permit or individual condominium releases short of asserting that it was not technically required to do so. Ultimately, Crawley and Chrisdom ran out of money, by which time Crawley had spent some $200,000 of his own money on the project and had gone without rental income from the now-empty apartment building for several years.[3]

---

[3] The apartment building was emptied at Flint's request; because Flint did not want to pay for relocation expenses, Crawley agreed to stop renewing his tenants' leases when the loan was originally discussed.

Flint agreed to, and did, loan Chrisdom an additional $359,465, but it had still not issued a building permit, and Crawley explained that it would still be insufficient to complete the project unless individual condominium units were released from the general lien, which release was again denied.

Flint commenced the instant suit against defendants on November 3, 2004, generally alleging breach of contract and seeking foreclosure of the mortgage. Defendants counterclaimed on March 8, 2005, alleging breach of contract and slander. Midway through the trial, the trial court permitted defendants to amend their defenses and affirmative defenses to include frustration of purpose and impossibility, noting that the addition of those theories would not be prejudicial to Flint.[4] The trial court ultimately agreed with Chrisdom and Crawley that Flint had frustrated the purpose of the contract and breached the contract. The trial court then released Chrisdom and Crawley from any obligations under the loans or mortgages to Flint and awarded an additional cash amount, albeit with the expectation that it would be used to pay at least two known outstanding subcontractor liens. This appeal followed.

"We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "When reviewing a grant of equitable relief, an appellate court will set aside a trial court's factual findings only if they are clearly erroneous, but whether equitable relief is proper under those facts is a question of law that an appellate court

---

[4] Counsel for Flint argued that amendment was untimely and improper under the court rules, but did not claim that amendment would be prejudicial to Flint.

reviews de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). This Court reviews de novo as a question of law the proper interpretation of a contract, including a trial court's determination whether contractual language is ambiguous. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

Little published caselaw exists in Michigan on the doctrine of "frustration of purpose." The parties agree that the only real leading case on point is *Liggett Restaurant Group, Inc v City of Pontiac*, 260 Mich App 127; 676 NW2d 633 (2003). There, this Court explained that "[f]rustration of purpose is generally asserted where 'a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract.' " *Liggett Restaurant Group, supra* at 133-134, quoting Restatement Contracts, 2d, § 265, comment a, p 335. Furthermore, " '[t]he frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract' " and " 'the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.' " *Id.* at 135, quoting Restatement, § 265, comment a, p 335. It is undisputed that Flint did two things: (1) delayed the issuance of a building permit by more than a year after the Board of Appeals determined that the buildings were actually in compliance, which prevented Chrisdom from proceeding in a timely fashion to meet the contract's time requirements; and (2) refused to release individual ready-to-sell condominium units from the general lien despite being repeatedly advised that there was no other way to pay off the mortgage or to complete the project.

Flint primarily argues that Chrisdom assumed the risk that no building permit would be issued because such delays are predictable and Chrisdom represented

in the loan agreement that it had already obtained the proper permits. Without considering the unrebutted testimony that such averments are standard boiler-plate, we are unimpressed given the *actual knowledge* by not only Flint, but by the same department, that Chrisdom did not actually have those permits and, moreover, the actual knowledge *and* explicit agreement in the contract that Chrisdom had not yet actually prepared architectural plans, which the unrebutted evidence explained was a prerequisite to obtaining a building permit. While we agree that there is always some risk of a delay in any permitting process, the unchallenged evidence was that Flint never even conducted an inspection, repeatedly insisted that Chrisdom needed to modify plans that the board of appeals ruled were compliant, and generally gave Chrisdom a run-around for more than a year.

Further, at the same time Flint was inexplicably holding up the necessary building permit, it was paying out construction loan monies to Chrisdom. Indeed, by the time the permit was actually issued, the entire contract amount had been paid out, less sums arbitrarily deducted by the city for interest in advance of loan disbursement and attorney fees, neither of which was provided for in the loan agreement. This dichotomy, by itself, is powerful evidence that while the permit delay was wreaking havoc with Chrisdom's orderly progression of construction, there was no ultimate intent on the part of Flint to deny a permit if it wanted its money back. In short, the evidence does not show that Chrisdom encountered a known, if perhaps unlikely risk; rather, the evidence suggests that Flint *actually interfered* with Chrisdom's acquisition of the building permit, whether through incompetence or through actual malice.

Flint next presents what can best be described as a confused argument to the effect that Chrisdom brought its troubles on itself by performing work out of sequence and inefficiently without the permit. The evidence actually showed that Chrisdom essentially did what it could to keep the project running in the absence of the permit and that its only other alternative would have been to do nothing. The evidence further showed that Chrisdom tried to obtain additional third-party funding, but it could not do so because Flint refused to subordinate its loan position. Interestingly, the type of loan involved here—a HUD "Section 108 loan"—is, according to defendants' financial underwriter expert, specifically intended to be used to attract additional funding from other lenders and to be subordinated to those lenders. The expert also explained that it appeared to him that at some point, Flint inappropriately started treating the loan as its own money.

Finally, Flint refused to allow individual condominium units to be released from the general lien so that they could be sold. Flint's project manager testified that she did not recall being asked about individual lien releases; however, numerous other witnesses testified that Crawley *did* ask for those releases, that the project manager and other officials were indifferent and unresponsive to any attempts at communication, or both. We defer to the superior position of the trial court to evaluate witness credibility. Given the other testimony of incompetence or even active hostility toward the project on the part of Flint and the relevant department, we find overwhelming evidence that Flint intentionally or incompetently prevented its mortgagor from being able to repay the mortgage. The trial court did not commit clear error by ruling that Flint frustrated the purpose of the contract.

We also conclude that the trial court correctly found that Flint breached the contract. Flint raises a number of arguments, none of which we find have any merit. Ultimately, we conclude that Flint breached the contract on the basis of the same evidence that shows Flint frustrated the purpose of the contract: Flint's unjustified refusal to issue a building permit and unjustified refusal to release completed condominium units from the general lien guaranteed the failure of the project. We have not been presented with any evidence or argument to the contrary.

We agree with the trial court that computing the damages in this case is difficult and not easily subject to fine-tuning. We are persuaded to affirm the trial court's award for several reasons. First, the trial court clearly wrestled with the issue and it was in a better position to assess the nuances of this case. Second, at no time did Flint challenge Crawley's testimony on damages or attempt to offer its own proofs on damages. Third, Flint concedes that the total value of the trial court's award is approximately the same as Crawley's estimate. Fourth, damages need not be mathematically precise, and after careful consideration, we are of the view that the trial court's award is as close to precision as possible on these facts.

We briefly address Flint's assertion that Chrisdom and Crawley have reaped a double windfall as a result of the outcome of this matter. Specifically, Flint points out that the cash award is roughly the amount of profit Crawley expected to make from the project, but in addition, not only has he been discharged from the mortgage, he has also received the Manhattan Place properties in an improved, albeit unfinished, state. This argument is only superficially appealing, however. The cash award was for the counterclaim for breach of

contract, and although it amounts to the expected profits had the project gone as it should have, it does not account for Crawley's personal contributions to the project and must be used to pay off any other liens or to complete the project.[5] The discharge of the mortgage was an *independent* equitable award, and Flint concedes that discharging all parties' obligations is proper under the frustration-of-purpose doctrine; moreover, we find no fault in the award given Flint's inequitable behavior.

For the above reasons, we disagree that the trial court erred by denying Flint's posttrial motions. We conclude that the trial court did an admirable job handling and resolving a long, difficult case, and we find no fault with its analysis of what transpired or the resultant remedy.

Affirmed.

---

[5] There was some testimony that an incomplete condominium is worthless. Moreover, Crawley's construction business and credit were apparently destroyed, making completion of the project significantly more difficult. Finally, a completed luxury condominium in the present housing market will not be worth as much as it could have at the time the project was commenced.